RENDERED: SEPTEMBER 24, 2020
TO BE PUBLISHED

# Supreme Court of Kentucky

2019-SC-0252-MR

CARLOS DEANDRE JENKINS                      APPELLANT

ON APPEAL FROM FAYETTE CIRCUIT COURT
V.            HONORABLE KIMBERLY N. BUNNELL, JUDGE
NO. 17-CR-01028

COMMONWEALTH OF KENTUCKY               APPELLEE

**OPINION OF THE COURT BY JUSTICE WRIGHT**

**<u>AFFIRMING IN PART, REVERSING IN PART, AND REMANDING</u>**

A Fayette Circuit Court jury convicted Appellant, Carlos Deandre Jenkins, of first-degree assault, eight counts of first-degree wanton endangerment, tampering with physical evidence, and of being a persistent felony offender (PFO). Jenkins was sentenced to life and fifty years, and now appeals to this Court as a matter of right. Ky. Const. §110(2)(b).

On appeal, Jenkins alleges the trial court erred by: (1) denying a missing evidence instruction, (2) admitting cell phone location evidence, and (3) failing to grant a directed verdict on the PFO charge.

For the following reasons, we affirm in part, reverse in part, and remand to the trial court for further proceedings consistent with this opinion.

Specifically, we affirm Jenkins's felony convictions, reverse his second-degree PFO conviction, and remand for re-sentencing.

## I. BACKGROUND

On the afternoon of June 12 and during the early morning hours of June 13, 2017, there were three separate shooting incidents in Lexington, Kentucky.

The first shooting happened during the afternoon of June 12 on Carneal Road.[1]  There, Jenkins drove by Vincent Howard walking toward a vehicle and fired shots at him.  The second shooting (also on Carneal Road) occurred at the residence of Summer Beatty, girlfriend of William Noland.  Howard and Noland were friends and Beatty let Howard stay upstairs at her home.  Howard was at the residence, but Noland was in jail when Jenkins drove up to Beatty's house and opened fire with two handguns.  The third shooting ensued shortly after the shooting at Beatty's residence.  Leading up to this final shooting, Jenkins backed into Asante Wardlaw's vehicle at a Thorntons gas station.  Wardlaw gave chase to Jenkins's vehicle and got a license plate number.  During the chase, Deondre Stokes, a passenger in Jenkins's car, fired shots at Wardlaw.

No one was seriously injured in the first and third shootings; however, during the second shooting, thirteen-year old Amaya Catching was shot in the back.  The bullet entered Catching's back near the shoulder blade and lodged

---

[1] Throughout the case and briefs, Carneal Road is alternatively referred to as Carneal Drive, Carneal Road, and Carneal-Highland Drive.  For clarity, we use Carneal Road in this opinion when discussing the first and second shootings.

in her spine, leaving her permanently paralyzed below the spinal cord injury. Police arrested Jenkins and Stokes for the three shootings.

The Commonwealth's theory of the case was that Jenkins (who claimed Noland and Howard robbed him) sought revenge. Jenkins used two handguns, a Glock 26 9mm and a stolen Glock 43 9mm, during the shootings. Stokes was the Commonwealth's main witness against Jenkins. Stokes was with Jenkins during all three shootings and fired shots at Wardlaw. He accepted a plea deal to testify against Jenkins.

Stokes told police that Jenkins would "borrow" used cars from Lucas Hubbard, the general sales manager at the Chrysler of Lawrenceburg dealership. Jenkins used the vehicles from the time they arrived on the lot until they were entered in the dealership's computer as inventory. Hubbard allowed Jenkins to use the vehicles in exchange for drugs.

Witnesses described different vehicles at various shooting scenes. Early in the investigation, this made it difficult for police to connect the shootings to a single shooter. Jenkins drove a silver vehicle during the first shooting. Linda Riley, a neighbor, described seeing a silver, teardrop-shaped vehicle with a deep scratch on the front passenger door drive away after the first shooting incident. Stokes confirmed Jenkins was driving a silver car that afternoon and testified Jenkins fired the shots at Howard. After the shooting, Scott Gilfedder, a neighbor, recovered two shell casings and a side mirror cover from a silver car and turned those items over to a Lexington police officer.

3

Shortly after the first shooting, Jenkins swapped vehicles—this time getting a blue 2016 Nissan Versa Note hatchback.  He drove the Nissan during the second and third shootings.  According to Stokes, Jenkins drove that car to Beatty's residence after midnight the morning of July 13.  Two of Beatty's neighbors described a blue vehicle leaving the scene the night of the shooting.  When police showed the witnesses vehicle photos, they identified the blue Nissan.

Stokes said that Jenkins drove to Beatty's residence with two Glock handguns, one with a 32-round magazine and one with a seven-round magazine.  According to Stokes, when he and Jenkins arrived at Beatty's residence shortly before 3:00 a.m., Jenkins stepped out of the vehicle and opened fire, emptying the magazines from both guns into the front of the house.  One of those shots hit Catching while she slept on a couch in the front room.  Police recovered thirty-five 9 mm shell casings at Beatty's residence.

Stokes told police that he and Jenkins threw shell casings out the window as they drove from Beatty's residence.  Stokes claimed they were unable to dispose of one of the guns in a trashcan because of police cars in the area.

Shortly after leaving Beatty's residence, Jenkins stopped at a Thorntons gas station to buy cigarettes.  Wardlaw was getting gas at the station during Jenkins's stop.  As Jenkins was leaving, he backed into Wardlaw's car and did not stop.  Wardlaw followed the car and saw it side-swipe another vehicle.  During Wardlaw's pursuit Stokes fired shots at Wardlaw on Walden Avenue.

4

Wardlaw called 911 and attempted to flee from the blue Nissan. When Wardlaw stopped at a traffic light, the blue Nissan came up behind him and Jenkins got out with a gun in his hand. No shots were fired at that point.

Wardlaw followed the 911 dispatcher's instructions and returned to the Thorntons gas station to meet with police. Later that day, a resident on Walden Drive near where Wardlaw said shots were fired, found three shell casings and turned them over to police. Stokes later confirmed Wardlaw's version of events to police.

When Jenkins attempted to return the Nissan to Hubbard, Hubbard would not accept the vehicle once he saw the damage to the car. When Jenkins and Stokes attempted to clean the vehicle with bleach, a suspicious neighbor, Michael McCoy, photographed them and called police. Officer Nally responded to the call. Nally testified that there was a strong smell of bleach and visible residue from a recent cleaning. Nally had the vehicle towed.

Lexington Police Detective Robert Wilson was assigned as lead detective for the Carneal Road shootings. During his investigation, Detective Wilson located Hubbard and obtained Jenkins's and Stokes's names from him. Once he had the names, Wilson tracked down two cell phone numbers used by Jenkins and Stokes and acquired historical cell phone reports from the two phone companies.

After Detective Wilson obtained the historical cell phone reports for Jenkins's and Stokes's cell phones, he gave that information to Lexington Police Sergeant Tyson Carroll, who specialized in electronic evidence. Sergeant

Carroll mapped cell tower coordinates from the cell phone reports focusing on time periods surrounding the shootings. The towers identified in both cell phone reports were located close to Carneal Road.

Police recovered the Glock 43 9 mm pistol during their investigation but were unable to locate the Glock 26 9 mm. Eight spent casings from the late-night Carneal Road shooting matched the Glock 43. The remaining 27 shell casings (including the two casings recovered from the Howard shooting, the casings from the Beatty residence shooting, and the three casings recovered from Walden Drive) were fired from the same unknown gun and were consistent with having been fired from a Glock. Ten projectiles recovered from Beatty's residence had not been fired from the recovered Glock 43. However, those bullets did match the hammer forged rifling of a Glock 9 mm handgun.

At trial, the jury found Jenkins guilty of first-degree assault, eight counts of first-degree wanton endangerment, tampering with physical evidence, and found him to be a second-degree PFO. The jury recommended a life sentence plus consecutive terms of imprisonment for the remaining offenses. The trial court imposed a sentence of life and fifty years' imprisonment to run concurrently.

## II. ANALYSIS
### A. Failure to Give Missing Evidence Instruction

Jenkins argues the trial court erred in denying his request for a missing evidence instruction for the pretrial destruction of three shell casings recovered by police from Walden Drive. Ballistics lab analysis matched those three

casings with casings recovered by police on Carneal Road. The Lexington Police's Division of Property and Evidence destroyed the three shell casings on July 9, 2018.

Jenkins filed a motion to exclude evidence and testimony relating to the three shell casings. In that motion, Jenkins also included a request for a missing evidence instruction. At a hearing held on February 14, 2019, the trial court heard testimony from two witnesses, Michael Cook, Head of the Lexington Police Property and Evidence Division, and David Day, a retired Lexington police officer. The trial court overruled the motion to exclude any evidence about the three shell casings and ruled it would not provide the jury with the requested missing evidence instruction.

Although the trial court found the police had intentionally destroyed the shell casings, the trial court further found the police did not act in bad faith. Further finding the shell casings had no obvious exculpatory value, the trial court ruled there was no violation of Jenkins's due process rights. The trial court specifically relied on this Court's decision in *Estep v. Commonwealth*, 64 S.W.3d 805, 810 (Ky. 2002), in which we said: "absent some degree of 'bad faith,' the defendant is not entitled to an instruction that the jury may draw an adverse inference from that failure."

Cook and Day testified about the case history of the three shell casings and their destruction pursuant to police department procedures. Officer Day retrieved the three casings when he was dispatched to a residence on Walden Drive during the afternoon following the previous early morning shootings.

7

Owen Hollinsworth, a resident of Walden Drive, found the three casings at the end of his driveway where it met the street. Hollingsworth turned them over to Officer Day.

Officer Day checked with dispatch to see if any shootings had been reported in the area where the casings were found and received a negative response. Following Lexington Police Department procedure, Officer Day, who had served over a decade in the Lexington Police Department's forensics unit, booked the casings in the property room as "found property." Found property lacks an identified owner and is not attached to any known active case. Cook testified the designation meant that under standard operating procedures, if the property was not otherwise identified in the interim, it would be destroyed in ninety days.

When Cook sought to destroy the casings (still identified as "found property") ninety days later, they had been checked out by Detective Wilson. Detective Wilson sent the three casings to the Kentucky State Police Crime lab along with the shell casings from the two Carneal Road shootings. KSP crime lab firearms examiner Lawrence Pilcher determined that the three casings matched recovered shell casings from the two Carneal Road shootings. However, the casings did not match the 9 mm handgun police had in evidence. Lab analysis determined that the casings recovered on Walden Avenue and most of the recovered casings from the two Carneal Road shootings were fired from a 9 mm handgun never recovered by police.

After the three casings were returned from the lab to the property room, the Commonwealth's Attorney's office checked them out for review and again returned them to the property room. In December 2017, Officer Day was sent a standard computer-generated email advising him that the shell casings were still in evidence and inquired about disposal. For the casings to be destroyed, Officer Day had to sign and return a form.

Officer Day checked to determine if there were any police actions connected to the found property case number and he determined there were none. Despite significant activity noted on other case numbers including lab analysis matching the three shell casings with shell casings fired from an unknown gun used in the Carneal Road shootings, no officer or detective had changed the designation of the three casings from "found property" to "evidence." Once the signed form was returned by Officer Day, the property division followed standard procedures for found property and destroyed the casings several months later.

At trial, Detective Wilson took responsibility for not changing the designation on the three casings from "found property" to "evidence." Wilson stated he assumed that the casings had been entered as evidence rather than found property—an assumption he never verified. Routine trial preparation led to the discovery of the destruction. Jenkins filed a motion to exclude any evidence or testimony relating to the three casings and requested a missing evidence instruction. As noted above, the trial court overruled the motion and denied the requested instruction. The issue is preserved for appeal.

9

A missing evidence instruction serves as a "cure" for a due process violation caused by intentional prosecutorial misconduct in destroying evidence. Not every intentional act of evidence destruction is a due process violation, and not every destruction requires a missing evidence instruction. When required, the instruction offsets the misconduct. We have explained:

> the testimony of these witnesses, while important, was not essential to the Commonwealth's case. The relief requested and denied was not dismissal or exclusion, but simply an instruction permitting the jury to draw a favorable inference for the defendant from the destruction of the evidence. Reversal with directions to give the requested instruction is the appropriate remedy. In *State v. Maniccia,* 355 N.W.2d 256, 259 (Iowa App.1984), in similar circumstances, the court held that a missing evidence instruction was sufficient to offset the prosecutor's misconduct.

*Sanborn v. Commonwealth,* 754 S.W.2d 534, 540 (Ky. 1988), *overruled on other grounds* by *Hudson v. Commonwealth,* 202 S.W.3d 17 (Ky. 2006)

In *Sanborn,* the prosecutor intentionally erased tape recordings of three witnesses in anticipation that the trial court would order them turned over to the defense. There, we noted the egregious circumstance coupled with the trial court's denial of the requested missing evidence instruction and we reversed. *Id.* That is not the nature of the factual situation in the present case.

When required, a missing evidence instruction must contain the language "intentionally and in bad faith lost or destroyed." *University Medical Center, Inc. v. Beglin,* 375 S.W.3d 783, 787 (Ky. 2011). We require the language in both civil and criminal cases. *Monsanto Co. v. Reed,* 950 S.W.2d 811, 815 (Ky. 1997). A missing evidence instruction is not required unless both elements (intentional destruction and bad faith) are present. A review of

10

the record supports the trial court's determination that the intentional destruction of the shell casings was not carried out in bad faith.

The police's destruction of the three shell casings was described by the trial court as regrettable and not the best practice for maintaining evidence. However, Cook's and Day's testimonies make clear that both followed existing police department procedures regarding the shell casings. Destruction flowed from the designation of the casings as "found property" and there was no bad faith in the police conduct.

Conceivably, if Detective Wilson had verified the designation and changed it to "evidence," the Commonwealth would have had the actual casings for the jury to view. Instead, the Commonwealth relied on the testimony of KSP firearms examiner Lawrence Pilcher and Jenkins's codefendant Stokes to connect the shells on Walden Drive to the shells found on Carneal Road. This mishap forced the Commonwealth to spend time explaining a mistake to the jury.

Merely looking at the shell casings reveals no visible exculpatory value, an essential element required for a due process violation claim to succeed. As a result, the trial court found no violation. "In failure-to-preserve cases, the defendant must also be able to show both that the missing evidence 'possess[ed] an exculpatory value that was apparent before the evidence was destroyed' and that he was 'unable to obtain comparable evidence by other reasonably available means.'" *McPherson v. Commonwealth*, 360 S.W.3d 207, 217 (Ky. 2012) (*quoting California v. Trombetta,* 467 U.S. 479, 489 (1984)).

11

Merely looking at the shell casings revealed nothing beyond the caliber and type of ammunition. There was nothing that distinguished these three casings from any other spent shell casings recovered by police and stored in evidence.

As noted above, KSP firearms examiner Pilcher concluded after extensive laboratory examination that the casings were fired from the same unidentified gun as most of the shell casings recovered from the two Carneal Road shootings. Stokes described the make and model of that gun, admitted he fired it on Walden Avenue, and claimed Jenkins fired it during the two Carneal Road shootings. These two witnesses connected the shell casings to the three shootings, and that connection was vital for the Commonwealth. Preserving the casings would have been more beneficial to the Commonwealth than to Jenkins and the destruction provided Jenkins with a claim about the overall competence of the police investigation.

At the hearing, Jenkins claimed that the destruction of the shell casings left his expert unable to test critical evidence and those tests might have proven exculpatory. As the United States Supreme Court made clear:

> We have held that when the State suppresses or fails to disclose material exculpatory evidence, the good or bad faith of the prosecution is irrelevant: a due process violation occurs whenever such evidence is withheld. *See Brady v. Maryland,* 373 U.S. 83 (1963); *United States v. Agurs,* 427 U.S. 97 (1976). In [*Arizona v.*] *Youngblood*, by contrast, we recognized that the Due Process Clause "requires a different result when we deal with the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." 488 U.S. [51, 57 (1988)]. We concluded that the failure to preserve this "potentially useful evidence" does not violate due process "*unless a criminal defendant can show bad faith on the part of the police.*" *Id.,* at 58,

12

(emphasis added).

*Illinois v. Fisher*, 124 S. Ct. 1200, 1202 (2004).

We will not disturb the trial court's finding in this case that the police conduct lacked bad faith, as the finding was not clearly erroneous. We have stated:

> As an appellate court, we defer to the trial court's findings of fact and we do not disturb those findings on appeal unless those findings are clearly erroneous. CR 52.01. "A factual finding is not clearly erroneous if it is supported by substantial evidence." *Hunter v. Hunter,* 127 S.W.3d 656, 659 (Ky. App. 2003). "Substantial evidence is evidence, when taken alone or in light of all the evidence, which has sufficient probative value to induce conviction in the mind of a reasonable person." *Id.*

*Garland v. Commonwealth*, 458 S.W.3d 781, 786 (Ky. 2015).

Here, the trial court based its finding of fact that the evidence was not destroyed in bad faith on substantial evidence. Therefore, the trial court did not err in denying the missing evidence instruction.

### B. Cell Phone Location Evidence

Jenkins argues the trial court erred in admitting cell phone location evidence. Specifically, Jenkins's allegation of error centers around the testimony of Lexington Police Sergeant Tyson Carroll.[2] Before trial, Jenkins filed a motion in limine to exclude cell phone location testimony, arguing Sergeant Carroll was not qualified as an expert witness and that any testimony he would give as to cell phone location would be "irrelevant, inadmissible under KRE 702 and *Daubert*, and would be more prejudicial than probative." The

---

[2] Sergeant Carroll is alternatively referred to in the record as both Sergeant and Detective. For clarity, this opinion uses the Sergeant designation.

13

trial court found that Sergeant Carroll could qualify as an expert and that the evidence could be admitted at trial.

On direct examination, Sergeant Carroll testified about how he used the historical cell data. Detective Wilson had given Sergeant Carroll two sets of cell phone records and background information about the case. Wilson gave Carroll time parameters for each of the three shootings. Carroll then created three maps that included multiple towers in the vicinity of each of the shootings. On these maps, Carroll put notations with times the two phones accessed the towers.

Carroll testified about the limitations of historical data analysis. He explained that a tower in a city will have a smaller "footprint" than a tower in the country. He stated that there are ways to determine the size of the footprint, but that he could not do so. During direct examination, the Commonwealth asked Carroll about movement from the scene of the first shooting, Carroll was careful to explain that the phone's particular travel could not be plotted using the data from the towers. Rather, Carroll explained that he could only tell that the phones were moving from the north side of the map to the south side. Carroll testified that he could not determine the particular location of either phone with any granularity.

Sergeant Carroll's testimony and maps provided the Commonwealth with means to challenge Jenkins's alibi that he was across town in his apartment at the Metropolitan apartment complex at the time of the shootings. Based on Sergeant Carroll's testimony and maps, Jenkins's phone was not connected

14

with towers near his apartment when the shootings occurred. Further seeking to buttress Stokes's testimony that he and Jenkins were together during the shootings, the Commonwealth also offered Sergeant Carroll's testimony and maps to show the two men's cellphones connected to the same cell towers near the shooting locations at the critical times in question.

The Commonwealth also asked Carroll questions regarding the movement of the two phones between the second and third shootings. The Commonwealth asked if the two phones "separated" between those shootings. Carroll asserted that they did not appear to separate at any point. The Commonwealth then asked if the phones were together the entire time, to which Carroll responded, "yes." These are the specific questions and answers Jenkins now claims resulted in error. The defense raised no objection to either of these questions or answers at trial. During cross examination, defense counsel had Carroll reiterate that he could only provide a general area for the location of the phone using the historical cell tower data. On cross, Carroll also testified that he could not show movement of a phone based on a "handoff" from one tower to another. Rather, he needed more than two data points to indicate movement of the phone. He testified that, using multiple data points, he could demonstrate a phone's general movement, but could not narrow that movement to a particular street.

Jenkins asserts that he preserved this claim of error through his motion in limine seeking to exclude cell phone tower data on the basis of relevancy, KRE 702 and *Daubert*, and that it would be more prejudicial than probative.

15

The trial judge overruled the motion in limine seeking to exclude the cell tower data.

As for motions in limine preserving errors for appellate review, we have recognized that "KRE 103(d) modified, but did not repeal, the contemporaneous objection rule of RCr 9.22 . . . ." *MV Transp., Inc. v. Allgeier*, 433 S.W.3d 324, 331 (Ky. 2014). We made clear that "the critical point in preservation of an issue remains: was the question fairly brought to the attention of the trial court." *Id.* (citing *Davis v. Commonwealth*, 147 S.W.3d 709, 722–23 (Ky. 2004) ("Where a party specifies [in its motion *in limine*] what evidence should be suppressed and why, the question has been 'fairly brought to the attention of the trial court' and the trial court's ruling preserves the issue for appeal.")). In *Lanham v. Commonwealth*, 171 S.W.3d 14 (Ky. 2005), we held that while a motion in limine is a proper means for bringing evidentiary issues to the trial court's attention, the contemporaneous objection rule was still alive and well. *Id.* at 20–21. We also held in *Lanham*:

> This is not to say, however, that a blanket motion *in limine* is sufficient to preserve an error for appellate review. As *Tucker* [*v. Commonwealth,* 916 S.W.2d 181 (Ky.1996) (overruled on other grounds by *Lanham,* 171 S.W.3d 14)] correctly observed:
>
>> An objection made prior to trial will not be treated in the appellate court as raising any question for review which is not strictly within the scope of the objection as made, both as to the matter objected to and as to the grounds of the objection. It must appear that the question was fairly brought to the attention of the trial court . . . . One claiming error may not rely on a broad ruling and thereafter fail to object specifically to the matter complained of.

*Id.* at 183.

16

Because defense counsel did not make a contemporaneous objection regarding Carroll's testimony about which Jenkins now complains, we must determine whether Jenkins's motion in limine preserved the alleged error for our review. As noted, for a motion in limine to preserve an issue for appeal, it must bring the particular error argued on appeal to the attention of the trial court "both as to the matter objected to and as to the grounds of the objection." *Tucker,* 916 S.W.2d at 183.

In his motion in limine, Jenkins first argued that the cell tower location evidence was not relevant. According to Jenkins's argument, "[a] ping is only relevant if the Commonwealth proves that a cell phone connects to the geographically nearest tower." Jenkins asserted that because there are several factors that determine which tower a cell phone connects to, the Commonwealth could not show that phones always connect to the nearest tower, rendering the cell tower information irrelevant. The trial court overruled the motion, finding that the historical cell phone tower data was relevant. Jenkins does not make any relevancy arguments concerning the historical cell tower data in this appeal.

Next, in his motion in limine, Jenkins argued that cell tower location evidence failed to meet the requirements of KRE 702 (regarding scientific evidence) and *Daubert.* He argued that the premise underlying cell phone location data testimony is "misleading, if not false." The trial court overruled his motion on these grounds. Jenkins did not appeal on the basis of KRE 702 or *Daubert.*

17

Jenkins's third argument in his motion in limine regarding the introduction of historical cell phone tower data was that Sergeant Carroll was not qualified to offer an expert opinion about the cell phone location data. Jenkins claimed Carroll lacked the appropriate qualifications to be named an expert on the topic, as he was "not equipped to testify about how likely a phone is to ping to the closest geographic tower" or "whether the phones in question in *this* case were pinging to the geographically closest tower . . . ." The trial court overruled Jenkins's motion on these grounds as well—and Jenkins does not raise Carroll's qualifications as an expert witness on appeal.

Jenkins's final argument in his motion in limine was the cell tower location evidence is more prejudicial than probative. He asserted that the limited probative value of the evidence was outweighed by the danger of undue prejudice. He asserted the jury "would necessarily speculate on whether a ping hit the geographically closest tower . . . ." Jenkins argued that to allow the jury to engage in such speculation would deprive Jenkins of his right to due process. The trial court denied Jenkins's motion in limine on this ground as well. Just as the other claims detailed above, Jenkins does not raise an argument on appeal regarding any alleged undue prejudice engendered by the use of the historic cell tower data.

This Court has held "[a]n appellate court 'is without authority to review issues not raised in or decided by the trial court.'" *Ten Broeck Dupont, Inc. v. Brooks*, 283 S.W.3d 705, 734 (Ky. 2009) (quoting *Reg'l Jail Auth v. Tackett*, 770 S.W.2d 225, 228 (Ky.1989)). In *Brooks*, we held that "the objections made in

18

the motion in limine, that the evidence was 'irrelevant and unduly prejudicial,'" did not support the "new argument" brought before this Court. *Id.* Since the issue had not been presented to the trial court, it was not preserved and we did not address it. *Id.*

In this case, Jenkins brings a "new argument" on appeal. We rejected a new argument that was never presented to the trial court being argued for the first time on appeal in *Brooks.* Jenkins argues to this Court—for the first time—that Sergeant Carroll's testimony regarding Jenkins's and Stokes's phones not "separating" between the last two shootings was not in line with our holding in *Holbrook v. Commonwealth,* 525 S.W.3d 73 (Ky. 2017).

In *Holbrook,* we held:

> the admission of historical cell-site evidence to establish an individual's location is a matter to be assessed carefully. Critically, Special Agent Horan's testimony expressly identified limitations in the scientific techniques he employed. Specifically, when asked about a particular call made by Bryant, Special Agent Horan explained that he was unable to identify the exact boundaries of the phone's "footprint" during the time of that call. Further, Special Agent Horan's testimony only established the general locations of the callers, rather than asserting the callers were at a fixed position.

*Id.* at 82. Here, just as in *Holbrook,* Carroll testified as to the limits of historical cell phone tower data. He explained to the jury that the phones' particular travel could not be plotted using the data from the towers. Rather, Carroll stated he could only tell that the phones were moving from the north side of the map to the south.

Carroll further testified that he could not determine the particular location of either phone with any granularity. While Carroll did say that

19

Jenkins's and Stokes's phones did not appear to separate at any point and answered "yes" in response when the Commonwealth inquired if the phones were together the entire time, these were fleeting statements within the whole of Carroll's testimony. On cross examination, defense counsel had Carroll reiterate that he could only provide a general area for the location of the phone using the historical cell tower data—something he was careful to point out on direct as well. On cross, Carroll also testified that he could not show movement of a phone based on a "handoff" from one tower to another. Rather, he needed more than two data points to indicate movement of the phone. He testified that, using multiple data points, he could demonstrate a phone's general movement, but could not narrow that movement to a particular street. Even assuming Carroll's testimony exceeded the boundaries outlined in *Holbrook*, any resulting error would have been harmless given the context of the rest of Carroll's testimony.

As discussed, however, Jenkins's argument on appeal is based on different grounds than his motion in limine. Just as in *Brooks*, this argument is not preserved. As to this Court's review for palpable error, we have held: "Absent extreme circumstances amounting to a substantial miscarriage of justice, an appellate court will not engage in palpable error review pursuant to RCr 10.26 unless such a request is made and briefed by the appellant." *Shepherd v. Commonwealth*, 251 S.W.3d 309, 316 (Ky. 2008). Jenkins did not request palpable error review and there are no extreme circumstances amounting to a substantial miscarriage of justice herein.

20

## C. Directed Verdict Motion as to PFO

Jenkins's final argument is that the trial court erred in failing to grant his motion for a directed verdict on the PFO charge, as the Commonwealth failed to prove that Jenkins had been sentenced to a term of one year or more imprisonment. Jenkins preserved this claim at trial by moving for a directed verdict on the charge, which the trial court denied.

Under the relevant jury instructions, to convict Jenkins of being a PFO, the jury had to find that he "was convicted of a felony offense by final Judgment of the Third Judicial Circuit Court in Michigan on April 22, 2013," and that "he was sentenced to a term of imprisonment of one (1) year or more for each conviction." These jury instructions were in line with KRS 532.080, which reads, in pertinent part:

> (2) A persistent felony offender in the second degree is a person who is more than twenty-one (21) years of age and who stands convicted of a felony after having been convicted of one (1) previous felony. As used in this provision, a previous felony conviction is a conviction of a felony in this state or conviction of a crime in any other jurisdiction provided:
>
> > (a) That a sentence to a term of imprisonment of one (1) year or more or a sentence to death was imposed therefor . . . .

Jenkins pleaded guilty in Michigan to attempt to carry a concealed weapon. Under Michigan Compiled Laws §750.227(3), carrying a concealed weapon is a "felony, punishable by imprisonment for not more than 5 years, or by a fine of not more than $2,500.00." Pursuant to Michigan's attempt statute:

> 2. If the offense so attempted to be committed is punishable by imprisonment in the state prison for life, or for 5 years or more, the person convicted of such attempt shall be guilty of a felony,

21

punishable by imprisonment in the state prison not more than 5 years or in the county jail not more than 1 year;

3. . . . in no case shall the imprisonment exceed ½ of the greatest punishment which might have been inflicted if the offense so attempted had been committed.

These statutes make it clear that the crime for which Jenkins pleaded guilty was a felony, punishable by up to two and a half years' imprisonment.[3]

With the above facts undisputed by the parties and clear in the record, the disputed issue remains whether Jenkins's Michigan felony conviction qualifies for application of KRS 532.080.  Both parties request we resolve an apparent conflict between two of this Court's opinions, *James v. Commonwealth*, 647 S.W.2d 794 (Ky. 1983), *reversed on other grounds* by *James v. Kentucky*, 104 S. Ct. 1830 (1984), and *Commonwealth v. Derringer*, 386 S.W.3d 123 (Ky. 2012).

James had entered a guilty plea in Nebraska to felony forgery and was sentenced to two years' probation.  *James*, 647 S.W.2d at 796.  James argued to this Court that the Nebraska conviction did not meet KRS 532.080(2)'s requirement, as he was not sentenced to a term of imprisonment of one year or more.  *Id.*  In *James* we noted that:

The Commentary accompanying this subsection in the Kentucky Penal Code, Final Draft November 1971, p. 347, is as follows:

---

[3] In Kentucky, carrying a concealed deadly weapon absent a prior felony conviction is a Class A misdemeanor under KRS 527.020.  Pursuant to KRS 506.010, when the crime attempted is a Class A misdemeanor, it is reduced to a Class B misdemeanor.  Therefore, the crime to which Jenkins pleaded guilty would have been a Class B misdemeanor in Kentucky, and the term of imprisonment he received could not have exceeded 90 days.  KRS 532.090(2).

> "Subsection (2) sets forth a definition of a previous felony conviction. It requires in Subdivision (a) that the previous offense must have been accompanied by a sentence of imprisonment for one year. *This requirement seeks to account for the possibility of conviction from a state which has a distinction between felony and misdemeanor that is different from that used in this state.* Thus, although such conviction is for an offense designated in that other state as a misdemeanor, it can be treated as a felony for purposes of this statute if it carried a penalty of one year or more." (Emphasis added.)

*Id.* We used our interpretation of the Commentary to hold that "the statute does not require actual imprisonment."

We emphasize that, while the statute does not require actual imprisonment, it does require proof of the imposition of a sentence of one year or more, even if the sentence was then probated. In Kentucky, sentences are first *imposed* and *then* probated. This is not the case in all states. As the Commonwealth points out,

> *James* does not indicate that the trial court in Nebraska ever set a term of imprisonment. (It would not have, because, there, at the time of probation revocation, the trial court imposes a *new* sentence that it could have imposed at the time of the original conviction. Neb. Rev. Stat. §29-2268(1); 1971 Neb. Laws LB 680, §23.)

(Emphasis added.) This differing procedure in Nebraska means that James was sentenced to two years' probation—not sentenced to two years' imprisonment and then had that sentenced probated. This procedure is more akin to our pretrial diversion, which we will take up below when analyzing our *Derringer* opinion. James was not sentenced to *any* term of imprisonment related to his Nebraska forgery conviction. As discussed below, the

23

Commonwealth failed to present proof in support of Jenkins's second-degree

PFO conviction that he was ever sentenced to *any* term of imprisonment by the

Michigan court.

In *James*, this Court also considered the fact that "the offense in

Nebraska was a forgery, which is a felony in this state." *Id.* That consideration

is in no way part of the statutory framework and cannot become part of the

analysis of this issue. KRS 532.080(2) provides, in pertinent part:

> As used in this provision, a previous felony conviction is a
> conviction of a felony in this state or conviction of a crime in any
> other jurisdiction provided:
>
> > (a) That a sentence to a term of imprisonment of one
> > (1) year or more or a sentence to death was imposed
> > therefor . . . .

Clearly, under KRS 532.080, the standard for using a conviction from another

jurisdiction is not that the crime would have been a felony under Kentucky law,

but that the other jurisdiction imposed "a sentence to a term of imprisonment

of one (1) year or more or a sentence to death." *Id.* Whether a crime from

another jurisdiction is a felony or a misdemeanor in this Commonwealth makes

no difference in determining whether it can be used for a PFO conviction. The

requirement is whether the defendant was sentenced to one (1) year or more in

the other jurisdiction.

In *Derringer*, 386 S.W.3d at 128, the Commonwealth argued "that the

focus of the PFO statute is on the prior felony conviction, not the imposition of

a sentence for that prior conviction." In that case, the Commonwealth argued

"the requirement that a sentence of one year or more or a death sentence be

imposed is intended merely to ensure the previous crime was a felony; and the 'intent and spirit of the statutory phrase is not about the final determination of the length of the sentence.'" *Id.* We rejected that argument, holding "[t]he plain language of KRS 532.080(2) provides specific requirements for previous felony convictions that must be met before a defendant can be indicted for being a PFO 2. One of the requirements is the imposition of a sentence to a term of imprisonment of one year or more or a death sentence." *Id.*

As we stated in *Derringer*, "[w]e are not at liberty to read this prerequisite out of the statute." We reaffirm our holding in *Derringer*: "If a sentence of one or more years' imprisonment or death has not been imposed, a felony conviction cannot meet the requirements of a previous felony conviction under the PFO statute; and the conviction cannot form the basis of a PFO charge." *Id.*

This Court did not expressly overrule *James* in *Derringer*. However, we do so today. To the extent that *James* allowed a prior out-of-state conviction to serve as the basis for a PFO in which the individual was not sentenced to imprisonment for a year or more or death, it is overruled. "In cases involving statutory interpretations, the duty of the [C]ourt is to ascertain and give effect to the intent of the General Assembly. We are not at liberty to add or subtract from the legislative enactment or discover meanings not reasonably ascertainable from the language used." *Commonwealth v. Harrelson*, 14 S.W.3d 541, 546 (Ky. 2000) (citation omitted). This Court failed to follow our

25

guideposts of statutory interpretation in *James* and that portion of the opinion cannot stand.

Turning back to the case at hand, we must determine if the certified documents from Michigan the Commonwealth presented during Jenkins's penalty phase to support the PFO charge provided proof that the Michigan court had imposed a sentence of one year or more imprisonment. We conclude under the proof presented in the documents in this case, it did not.

The first document titled "Settlement Offer and Notice of Acceptance" was a plea agreement signed by the prosecutor, defense attorney, and Jenkins. This document was never signed by the judge. It was marked with a check for "Sentence Agreement" and listed "2 ½ years" under the heading "Statutory Maximum Penalty." There is a hand-written notation of "Probation, 5 Days AWF, and HYTA if eligible." The "HYTA" listed on the plea agreement document refers to the Holmes Youthful Trainee Act. Both parties characterize the HYTA as creating circumstances comparable to Kentucky's diversion statute, KRS 533.250, with the relevant similarity being the offense is not a felony until and unless diversion is revoked.

The second document from the Michigan court is titled "Order of Conviction and Sentence" has a checkmark beside "Probation" and a handwritten notation reading, "1 o/HYTA." Further down the page beside the word "RECOMMENDATION" is handwritten "5 Days AWF."

The third document from Michigan is entitled "Order of Probation (Felony)-Non-PFO." On this document, beside the word "Term" is a

26

handwritten note reading, "1 yr o/HYTA." In addition to a large section of boilerplate language that imposes varying conditions often seen in Kentucky sentencing orders, there is "Section 17" with a box labelled "Other" that is marked. Next to the box, a handwritten note reads "5 DAYS AWF within 30 days."

The final document the Commonwealth presented from the Michigan court is titled "Order of Conviction and Sentence." It has a handwritten note reading, "Prob Viol." Under "Recommendation," it also contains a handwritten notation reading, "Prob. Closed. Rvok HYTA."

After a thorough review of the documents, the only reference to imposition of a sentence of a year or more was that 2 ½ years was written under "statutory maximum sentence" in the "Settlement Offer and Notice of Acceptance" that was never signed by the judge. We were unable to locate where a sentence of 1 year or more or death was *actually* imposed. The documents do not designate what portion of or if all the maximum possible term of imprisonment was imposed. As the documents stand, the required language for use as a prior felony conviction in Kentucky for PFO purposes is lacking.

We note that the version of Michigan Compiled Laws 762.11(1) in effect when Jenkins committed the offense provided: "if an individual pleads guilty to a criminal offense committed on or after the individuals seventeenth birthday but before his or her twenty-first birthday, the court . . . may *without entering a judgment of conviction* . . . assign that individual the status of youthful trainee."

27

(Emphasis added.) Under this statute, the court was not required to enter a judgment of conviction. Therefore, we assume that Jenkins's designation as a youthful trainee explains the absence of an order fixing his sentence.

It is unclear why the Commonwealth did not present a certified copy of a judgment of the Michigan court sentencing Jenkins after his probation was revoked. This court is bound to follow the evidence presented at trial and a judgment sentencing Jenkins to one year or more or the death penalty by the Michigan court is missing from the record in this trial. The missing element in the Michigan documents is the final judgment imposing a sentence. The last order in this case reflects that probation was revoked and the case was closed but fails to demarcate the final sentence imposed by the court. Applying our decision in *Derringer*, we conclude that the documents' failure to clearly indicate a sentence of one year or more or death leaves the Michigan felony unable to support a PFO sentence enhancement in Kentucky. The Commonwealth failed to introduce evidence that Jenkins had "a sentence to a term of imprisonment of one (1) year or more . . . imposed." KRS 532.080(2)(a). Therefore, the trial court erred in allowing the jury to consider this Michigan conviction to find Jenkins to be a PFO.

As the trial court should have dismissed the PFO charge or granted Jenkins's directed verdict motion, we reverse Jenkins's conviction for being a second-degree PFO, vacate his sentence, and remand to the Fayette Circuit Court for resentencing. As we have stated, "in those cases where the only reversible error relates to the PFO charge, there is a sentence on the underlying

28

charge, limiting the necessary proceedings on remand." *Montgomery v. Commonwealth*, 320 S.W.3d 28, 49, n.4 (Ky. 2010).

### III. CONCLUSION

For the foregoing reasons, we affirm in part, reverse and vacate in part, and remand to the trial court. Specifically, we affirm Jenkins's convictions for first-degree assault, eight counts of first-degree wanton endangerment, and tampering with physical evidence; but, we reverse his second-degree PFO conviction, vacate his sentence, and remand for resentencing consistent with this opinion.

All sitting. All concur.

COUNSEL FOR APPELLANT:

Robert Chung-Hua Yang
Assistant Public Advocate

COUNSEL FOR APPELLEE:

Daniel Jay Cameron
Attorney General of Kentucky

James Daryl Havey
Assistant Attorney General