**COLLINS COMPANY, Appellant,**

v.

**Harry ROWE and Katie Lee Rowe,
Appellees.**

Court of Appeals of Kentucky.

Feb. 16, 1968.

Rehearing Denied June 21, 1968.

G. D. Milliken, Jr., Milliken & Milliken, Bowling Green, for appellant.

John S. Cary, Burkesville, Richard L. Garnett, Dale Burchett, Glasgow, for appellees.

OSBORNE, Judge.

This is an appeal by the Collins Company from a judgment of the Cumberland Circuit Court in favor of Harry Rowe and his wife, Katie, in the total amount of $115,000 for injuries suffered by the appellees as a result of overexposure to carbon monoxide gas. The gas emanated from a gas refrigerator sold by the appellant, Collins Company, to the appellees and installed by them on a houseboat which they owned and kept on Dale Hollow Lake. It is contended upon this appeal that the judgment should be reversed on two grounds: first, that the injury was brought about by an intervening cause which was unusual and not foreseeable by appellant; and, secondly, where no danger exists in a condition which merely makes it possible for an injury to happen through some unrelated cause, the condition itself can not be held as the proximate cause of an injury. The facts surrounding the injury to Mr. and Mrs. Rowe are as follows:

In the spring of 1961, they purchased a houseboat which was equipped with a gas-operated refrigerator. Not being satisfied with the operation of the refrigerator, Mr. Rowe, in an attempt to replace it, called Collins Company which distributed gas refrigerators manufactured by Whirlpool Corporation. As a result of the call, Mr. Rowe learned that Collins did not sell directly to the consumer, but would ship the refrigerator to a Mr. J. D. Coffey, who was its local dealer in Burkesville. At the time Mr. Rowe initially contacted Collins Company, they pointed out to both Coffey and him that the only refrigerator they had in stock was one that had been designed and manufactured to use natural gas and certain parts would have to be exchanged in order to convert it for LP gas use. Rowe agreed to accept the refrigerator under these conditions and Collins agreed to ship it and supply the parts required for conversion. The refrigerator and parts were later shipped directly to Coffey. Shipment was made from the Whirlpool plant in Evansville, Indiana. Coffey testified that when the refrigerator was received it was securely crated in the customary manner and was not damaged in any way during shipment, and that upon receipt he removed the orifice spud from the refrigerator and replaced it with one furnished by the Collins Company as a part of the conversion equipment. There was nothing unusual about the refrigerator nor was the process of conversion unusual in any manner. The refrigerator was then delivered to Rowe, who employed Richard Radford, a licensed LP gas service man, to make the installation on the boat. This was accomplished sometime in August, 1961. After installation, the refrigerator functioned satisfactorily and without incident until December 8, 1961, when Rowe called Radford to the boat and complained that the refrigerator seemed to consume too much gas and wanted Radford to check it. Concerning this incident, Radford testified as follows:

"Then, we got back to the refrigerator. He wanted to check it again, which I did, and I looked at the blaze. We all looked at it and talked about it. The blaze looked like I had always been taught that the blaze should look. I took the things out though to see if I could see anything apparently wrong with it, took it apart. We discussed the thing, and he said it still wasn't doing like it ought to and I said, well, do you have the parts they sent with it, we can look at it and see whether or not—I said, by looking there is quite a difference in the orifice opening in the spud of a natural gas and a propane gas spud, so if you will get that we will look, to our satisfaction to see if it is the right one or not; so, they brought this out and it was much larger, and we all agree (sic) that it evidently had the right orifice in it. So, he wanted to know what else would be wrong. I said I had been told if the orifice hole was drilled a little crooked or different things, maybe that could cause it and the only thing I knew to do, we will try another one. So we took the large orifice.

2. Where did you get that one?

A  Mrs. Rowe pulled it from underneath the outside deck, I believe it was a cigar box with some little tools, bolts and screws and odds and ends in it, and this was in there, I carry a set of drills, a drill set for orifice spuds that we use when we go up to a larger size than this, such as changing cook ranges over from LP gas to natural gas. These orifices in a refrigerator are not numbered according to orfices (sic) on space heaters and things that we carry orifices for, and these drills are numbered by, so I couldn't put the number on these drills and compare it with the orifice number, so I took one of these drills and I found the size of this orifice. I took this large orifice and I put it over a punch. Just set this orifice spud right down over a punch, took my hammer and I peened down on that until I closed this opening, then I drilled it out the size of this opening as straight as I could drill it. I put it in the refrigerator and I couldn't tell any difference that it would help anything about it, or changed anything about it. We discussed that. We all decided that it hadn't helped it any, and I took this orifice out that I had peened out, and handed it over to, I believe Mrs. Rowe, or dropped it in the box she was holding, and left the refrigerator just as near as possible as I found it in the beginning.

Q.  Which orifice or part did you put back on to the refrigerator?

A  Well, I put the one on it that was on it originally. The one I peened out, I gave back to them. After an orifice spud has been beat on with a hammer, and then redrilled, you can look at it; you can tell where an orifice has been beat on or not; there is no question where one has been beat up if you look at it."

When Radford left the boat, he testified that it was his opinion that the refrigerator was functioning properly and was in a safe condition. On the following day, Mr. and Mrs. Rowe left the spot where they customarily docked the boat for a cruise. At the time, Mr. Rowe was piloting the boat and they were headed for a point in Casey Creek. When they did not appear in their store in Burkesville on Monday morning, an alarm was sent out which led to their discovery in the boat in Casey Creek on Dale Hollow Lake. The boat was moored in the usual manner. Fishing lines were out. Mr. Rowe was in the front section of the craft, in which the refrigerator was located, and was in a practically helpless condition. Mrs. Rowe was in the bunk room to the rear of the boat. She was in bed with the covers pulled about her in the normal posture of sleep. The parties suffered extensive and permanent injuries to their bodies as the result of exposure to carbon monoxide gas. Mrs. Rowe was, at the time of the trial, completely helpless and unable to communicate intelligibly. The room where Mr. Rowe was found was in complete disarray and gave evidence that for some time he had been unconscious but physically able to thrash about. The front window of the boat was partially open and the jalousie windows were not completely closed. Mr. Rowe's injuries were not as extensive as were those of Mrs. Rowe. He was able to testify at the trial but, because of loss of memory due to inhalation of the gas, was not able to supply any significant testimony as to what took place. Rowe testified that on Sunday night he recalled he and his wife being in the boat and becoming confused and turning around; that it was drizzling rain and hard to see; that he went down to an inlet where he had heard that some ducks had been coming in and he recalled a boat being parked and so he went up a little farther where he blacked out; that he knew nothing further until he came to on Monday; that upon coming to he thought it was Sunday morning; that at the time he was lying on the floor by the couch; that he heard his wife breathing

heavily and that at the time he thought she was snoring; that he had taken his contact lenses out, and was in a sort of dazed condition. He testified that he yelled for his wife but she did not answer. He tried to rouse her and couldn't get her up. At this stage, he would pass out and come to. He opened the back door of the boat next to his wife's head and one window in the front, then later sometime he got the right door open. He knew something was wrong but did not know what. In order to try to attract someone, he blew the horn every now and then. His testimony was that he did not know how often he did this and that every time he got up he would fall against the table and chairs. At one time he got terrible cold and closed the door by the bunks where he was sitting. He testified that he was found by Randy Webb.

Upon cross-examination, Mr. Rowe testified that he took 32 cans of beer on board for the trip in question and that he drank two or three cans before leaving the dock, but denied being drunk. After the accident an empty fifth whiskey bottle was found on board the boat. Rowe testified that he had no memory of drinking from it. The evidence also disclosed a large number of drugs about, including narcotics presumably for medicinal purposes. This evidence was elicited by appellant upon cross-examination apparently for the purpose of casting doubt upon the cause for loss of consciousness and to demonstrate that Rowe could have attempted repairs on the refrigerator while in a drunken condition. This action was initially brought against Coffey and Radford, along with the appellant. The jury absolved Coffey and Radford from any liability.

Investigation and experiments after the accident revealed that the refrigerator was discharging carbon monoxide in "lethal quantities." The report, in further part, disclosed:

*"Visual Inspection of the Refrigerator revealed:*

1. Maximum flame which was hard, bushy, and noisy was impinging on the generator. (This was due to improper air shutter barrel adjustment.)

2. Minimum flame had a yellowish luminous appearance. (This should have been blue.)

3. The Burner Air Shutter Barrel (as shown in photograph 'A') was damaged, apparently from a tool during servicing.

4. The burner was loose on its mounting bracket and was spaced ¼″ from generator opening. (This spacing should have been ½″ and the burner mounting screw tight.)

*Burner Orifice Pressures were as follows:*

1. Maximum flame was 7.2″ wc. (This should have been 10.2″ wc.) (Line pressure was 10.7″ wc, which was satisfactory.)

2. Minimum flame was 0.9″ wc. (This should have been 0.6″ wc.)

*Disassembly of the Burner proved the following:*

1. A 182 orifice was installed instead of a 193.

2. The 182 orifice had been redrilled to the equivalent of a 177 orifice. Redrilling of this orifice, which is contrary to recommendations, combined with orifice pressure used, resulted in the 3,000 BTU rating of this EGS 10 model, being exceeded by 1,400 BTU (total flow was 4,400 BTU) or 46.6%. (See orifice sketch 'B').

3. A double-groove (piped gas) turbulator was installed instead of a single-groove (LP-gas) turbulator. In addition, the turbulator was loose instead of being snug against orifice."

Coffey and Radford testified without contradiction that neither of them did anything

to produce damage to the Burner Air Shutter Barrel, nor did they leave the burner loose on its mounting bracket. There was no evidence that Coffey did anything to produce these things in the refrigerator. There was no showing that the refrigerator would have produced carbon monoxide in dangerous quantities if it had remained in the condition in which it was at the time that Coffey delivered it to Rowe and there is no satisfactory explanation in this record by which it may be determined exactly what caused the refrigerator to be in the condition in which it was found immediately following the accident.

Appellees in their brief before this court insist that the Collins Company was negligent for seven separate reasons, summarized as follows: (1) furnishing a refrigerator equipped to use natural gas when it knew that LP gas was to be used; (2) directing conversion for LP gas by substituting parts rather than replacing the entire burner unit; (3) in sending the wrong orifice spud for the conversion; (4) in failing to provide the proper LP turbulator; (5) in failing to supply appropriate information to Coffey and Radford to enable them to effect a safe conversion; (6) in failing to comply with the terms of the franchise contract which Collins had entered into with Whirlpool Corporation and which contract imposed upon Collins the prime responsibility of providing competent personnel to make proper installations and repair service; (7) in failing to warn the appellees, Coffey and Radford, that the refrigerator was dangerous and would produce carbon monoxide unless equipped with the proper parts and unless those parts were properly installed and maintained.

■ As to appellees' first contention, it should be pointed out that they knew the refrigerator was to be converted when they ordered it and consequently should not now complain of this fact.

■ As to the next five failings upon the part of the appellant, they are faulty in that the record does not show that the accident was brought about by any of them.

■ The seventh contention that the Collins Company failed to warn the appellees that the refrigerator was dangerous and would produce carbon monoxide, we believe to be faulty in that there is no showing that the refrigerator would or did produce carbon monoxide in lethal quantities until after it was tampered with and the parts damaged.

The uncontradicted proof in this action is that the production of the carbon monoxide was entirely due to improper servicing of the refrigerator—the mutilation of the burner barrel, the pinging or hampering of the hole in the orifice spud, the redrilling of a different size hole in the orifice spud and the careless reinstalling of the burner burner barrel, the pinging or hammering of upon the generator. The record is not clear as to who is responsible for this. However it is clear that Collins was not, nor was its dealer, Coffey. Radford testified that he pinged the orifice spud and put it back into the refrigerator and then took it out and replaced it with the one that had previously been in the refrigerator. Rowe concurred in all of this but said he believed Radford left the same one in the refrigerator that he had pinged. Be all of this as it may, the fact remains that the mutiliated orifice spud and burner barrel were in the refrigerator at the time of the accident. All of these facts are clearly shown by the investigative report upon which the appellees themselves base their case. All of the proof in the record shows without doubt that the refrigerator worked satisfactorily[1] for four months and there was no malfunction until after the parts were removed and mutilated.

■ Appellees' contention might have at least some validity if the accident had happened immediately after the refrigerator

1. Except for possibly using excessive gas.

was installed and before it had been tampered with. But, this case is not whether an unmutilated and properly installed refrigerator caused the accident but whether one that had been modified and tampered with caused it. The proof is overwhelming and uncontradicted that an unmutilated and properly installed burner barrel will not produce carbon monoxide in harmful quantities. The law is well settled in this jurisdiction that where no danger exists in a condition that merely makes it possible for an injury to happen through some independent, unrelated and efficient cause, the existing condition can not later be held to be the proximate cause of the injury. American Home Fire Assurance Co. v. Louisville Gas and Electric Company, Ky., 307 S.W.2d 562; Smith's Adm'r v. Corder, Ky., 286 S.W.2d 512; Morton's Adm'r v. Kentucky-Tennessee Light and Power Company, 282 Ky. 174, 138 S.W.2d 345; Sutton's Adm'r v. Kentucky Utilities Co., 245 Ky. 470, 53 S.W.2d 711. The broad, general rule which has universal application stated in 38 Am.Jur., 724, § 68 is as follows:

"A person's negligence is not the proximate cause of an injury which results, not from the concurrence of his negligence, as an active and efficient cause, with another cause in producing the injury, but from the intervention of a new and independent cause, which is neither anticipated nor reasonably foreseeable by the person, is not a consequence of his negligence, is not controlled by him, operates independently of his negligence, and is the efficient cause of the injury in the sense that the injury would not occur in its absence. The intervention of the new, independent and efficient cause severs whatever connection there may be between the person's negligence and the injury. As has been aptly said: 'The intervenor acts as a nonconductor and insulates the negligence.' So affected, the person's negligence is not actionable; it is the remote, and the independent intervening cause is the proximate cause of the injury."

An act which only furnishes the opportunity for the infliction of an injury is not the proximate cause of the injury, where the latter occurs as the direct result of some intervening force. Brown Hotel v. Levitt, 306 Ky. 804, 209 S.W.2d 70; Newton v. Wetherby's Adm'x, 287 Ky. 400, 153 S.W.2d 947.

The judgment is reversed.

WILLIAMS, C. J., and EDWARD P. HILL, PALMORE and STEINFELD, JJ., concur.