MONSANTO COMPANY, Appellant,

v.

William REED, et al., Appellees.

WESTINGHOUSE ELECTRIC
CORPORATION,
Appellant,

v.

MONSANTO COMPANY,
et al., Appellees.

Nos. 95–SC–549–DG, 95–SC–561–DG.

Supreme Court of Kentucky.

April 24, 1997.

Rehearing Denied Oct. 2, 1997.

Charles S. Cassis, Stephen R. Schmidt, Brown, Todd & Heyburn, Louisville, Arvin Maskin, Konrad L. Cailteux, Weil, Gotshal & Manges, New York City, for Westinghouse Electric Corporation.

Gregory L. Monge, W. Mitchell Hall, Jr., Ashland, John W. Vardaman, Jr., Williams & Connolly, Washington, D.C., for Monsanto Corporation.

Robert E. Reeves, Todd E. Leatherman, Robert G. Friedman, Reeves & Graddy, Lexington, David S. McCrea, McCrea & McCrea, Bloomington, IN, Lawrence R. Webster, Pikeville, for Appellees.

LAMBERT, Justice.

Appellees in this products liability action (plaintiffs in the trial court) are thirty seven (37) persons who claim to have been injured by exposure to polychlorinated biphenyls (PCBs). The exposure is alleged to have occurred in the course of appellees' employment as salvagers at Libby Iron and Metal Company (Libby).

Monsanto Company (Monsanto) was the sole manufacturer of PCBs, a chemical used in some electrical transformers and in capacitors. PCBs were banned by an Act of Congress in 1979. Monsanto had sold PCBs to Westinghouse Electric Corporation (Westinghouse), which used them in the manufacture of power distribution transformers and capacitors. Westinghouse manufactured two types of transformers, one containing PCBs and the other containing mineral oil. All of the transformers contained copper coils immersed in a dielectric fluid (composed of either PCBs or mineral oil) and sealed with an outer steel shell. After these devices were assembled, some were sold by Westinghouse to Kentucky Power Company, which after the useful life of the equipment, shipped the sealed and intact devices to Libby for salvage. With respect to the PCB-containing devices, appellees' central contentions are that the mineral oil transformers sent to the Libby site had been contaminated with PCBs at Westinghouse, and that the relatively small number of capacitors shipped to Libby were heavily laden with PCBs.

During the salvage process, employees of Libby dismantled the sealed transformers to facilitate recovery of the copper coils located inside. It is alleged that they also came into contact with the dielectric fluid in the capacitors. In addition to the claims of exposure during the process of recovering the copper from the transformers, appellees also claim to have been injuriously exposed when they burned the fluids from the transformers and capacitors for heat during the winter months and when they used the flames for cooking. Appellees allege that this contact, in addition to other incidental contact with the fluid in the transformers and capacitors resulted in physical injuries.

Five (5) Libby employees were selected as "bellwether" plaintiffs for the first trial of this case. In their suit, wherein damages were sought from both Monsanto and Westinghouse, the Pike Circuit Court granted summary judgment and held that a provision of the Product Liability Act (PLA), KRS 411.320, barred recovery on grounds that the dismantling of the transformers and capacitors constituted an unauthorized alteration or modification of the product. No appeal was taken and the judgment became final.

The remaining thirty seven (37) plaintiffs, appellees herein, chose to proceed with their actions under only a theory of common law negligence. The Pike Circuit Court again granted summary judgment, and held that Section 388 of the Second Restatement of Torts, recognized as authoritative in *Lloyd v. Lloyd*, Ky., 479 S.W.2d 623 (1972), barred

recovery. *Restatement (Second) of Torts* Section 388 (titled *Chattel Known to be Dangerous for Intended Use*). The Court of Appeals reversed the trial court and held that Section 388 did not apply because salvage of the transformers and capacitors was foreseeable and therefore a duty of care was upon Monsanto and Westinghouse for protection of appellees. The court also held that the Product Liability Act, KRS 411.300 *et seq.*, did not apply to claims based on common law negligence, reasoning that Section 54 of the Constitution of Kentucky prevents the General Assembly from limiting such actions. In addition, the Court of Appeals recognized as a new intentional tort "spoliation of evidence," and remanded the case to the trial court to allow appellees to amend their complaint to seek damages under that theory of recovery. The Court of Appeals also mandated that discovery be reopened to permit appellees to seek evidence in support of their contentions that Monsanto and Westinghouse had intentionally destroyed relevant documents.

■ The first matter to be addressed is the applicability of Section 388 of the Second Restatement of Torts, as follows:

### Chattel Known To Be Dangerous For Intended Use

One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier

a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and

b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and

c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.

This Section describes the circumstances under which the supplier of a dangerous chattel may be held liable and provides that suppliers of such chattels cannot be held liable in tort unless the chattel is used both in a manner for which it was supplied, and by a person for whose use it was supplied. The trial court was correct in stating that the chattels at issue in this action were "not supplied to be used as junk, but for power transmission," and were "not supplied to be used by the plaintiffs [appellees herein], only the third parties [Kentucky Power] in their business." This line of reasoning appears in *Lloyd v. Lloyd*, Ky., 479 S.W.2d 623 (1972), where the Court was unambiguous in its view that for Section 388 to apply, the defendant must have supplied the product for the purpose for which the plaintiff was using it when the injury occurred.

> The point we wish to make clear in this connection is that it is of no particular significance whether Bob had been using the mower as a guest on the premises or as a borrower at some other place, so long as it had been provided to him for the use to which he was putting it when he was injured.

*Id.* at 625. For purposes of our analysis in this case, Section 388 limits the suppliers' liability to foreseeable users of the chattel or foreseeable bystanders.

In the case at bar, the chattels were not being used in a manner intended nor foreseeable. In many jurisdictions which have considered this issue, courts have declined to find a duty of care running from the supplier of the goods to salvage yard workers who allege injury during the scrapping and dismantling of chattels. *See High v. Westinghouse Electric Corporation*, 610 So.2d 1259 (Fla.1992); *Richmond, Fredericksburg & Potomac R. Co. v. Davis Industries*, 787 F.Supp. 572 (E.D.Va.1992); *Wingett v. Teledyne Industries, Inc.*, 479 N.E.2d 51 (Ind. 1985); *and Johnson v. Murph Metals*, 562 F.Supp. 246 (N.D.Tex.1983). In a case virtually identical to this one, the United States District Court for the Western District of Pennsylvania analyzed similar cases from numerous jurisdictions and stated

[T]hese decisions do provide a persuasive basis for concluding, as a matter of law, that the dismantling and processing of junk electrical components was not a reasonably foreseeable use of GE's product, and the Court so finds. Accordingly, the allegations of injury as a result of the dismantling and processing of junk electrical components will be dismissed.

*Kalik v. Allis–Chalmers,* 658 F.Supp. 631, 635–36 (W.D.Pa.1987).

■ It has long been the law of this Commonwealth that a manufacturer is not liable when the injuries result from the mutilation or alteration of the chattel. Such intervening conduct severs any causal connection between the product and the injury. *Collins Company v. Rowe,* Ky., 428 S.W.2d 194 (1968). The Product Liability Act (PLA), KRS 411.300 *et seq.* codifies this and precludes imposition of liability on a manufacturer in cases where the product has not been used in its original, unaltered and unmodified condition.

■ The scope of the PLA is as follows: As used in KRS 411.310 to 411.340, a 'product liability action' shall include any action brought for or on account of personal injury, death or property damage caused by or resulting from the manufacture, construction, design, formulation, development of standards, preparation, processing, assembly, testing, listing, certifying, warning, instructing, marketing, advertising, packaging or labeling of any product.

KRS 411.300(1). The PLA applies to all damage claims arising from the use of products, regardless of the legal theory advanced. There is no language in the PLA which suggests that products liability actions mean only those actions based on strict liability in tort under Section 402A of the Second Restatement of Torts. As we read the Act, if a claim is brought against a seller or a manufacturer of a product which is alleged to have caused injury, then the PLA applies, regardless of whether the action is founded on strict liability in tort, negligence or breach of warranty. While each of these theories of recovery in products liability cases requires proof of different elements and has different implications (*Williams v. Fulmer,* Ky., 695 S.W.2d

411 (1985)), their central purpose is the same: recovery of damages for injury or property damage caused by a product.

The Court of Appeals expressed doubt as to the applicability of the PLA to common law negligence claims. In our view, this question was squarely resolved in *Reda Pump v. Finck,* Ky., 713 S.W.2d 818 (1986). The claim in *Reda Pump* was a negligence claim, the jury was instructed on negligence, and the opinion of this Court ordered the dismissal of all claims, negligence, breach of warranty and strict liability, on the basis of the PLA. The opinion, in pertinent part, is as follows:

> The appellee, James R. Finck, was injured when a pump manufactured by appellant exploded.... He sought damages based upon negligence, breach of warranty, and strict liability. The case was submitted to the jury under a comparative negligence instruction, and the jury found that appellant and Finck were each negligent and prorated liability.... Pursuant to this definition [of products liability action in KRS 411.300(1)], the action instituted by Finck is a "products liability action." ... The entire tenor of the Product Liability Act is to restrict and limit actions concerning products liability.... The judgment is reversed with direction that the complaint ... be dismissed.

*Id.* at 819–821.

■ Upon our determination that the PLA applies to the claims here under review, we must also determine whether a specific section of the Act bars appellees' negligence claims. In KRS 411.320(1), the PLA limits liability if the product has been altered or modified. KRS 411.320(1) states as follows:

> In any products liability action, a manufacturer shall be liable only for the personal injury, death or property damage that would have occurred if the product had been used in its original, unaltered and unmodified condition.

KRS 411.320(2) continues:

> In any products liability action, if the plaintiff performed an unauthorized alteration or an unauthorized modification, and such alteration or modification was a sub-

stantial cause of the occurrence that caused injury or damage to the plaintiff, the defendant shall not be liable whether or not said defendant was at fault or the product was defective.

Product alterations or modifications are defined within the same section as follows:

> For the purpose of this section, product alteration or modification shall include failure to observe routine care and maintenance, but shall not include ordinary wear and tear. This section shall apply to alterations or modifications made by any person or entity, except those made in accordance with specifications or instructions furnished by the manufacturer.

Regardless of whether the transformers and capacitors, or the PCBs are considered to be the product, the products were altered and modified during the salvage process at Libby. These facts have been admitted.

■ Appellees have presented the idea that the PLA is unconstitutional due to the purported abolition of a jural right. Under the concept of jural rights, it is asserted that some rights are so fundamental that they predate and exist independently of the Constitution of this Commonwealth. The view continues that jural rights are insulated from substantial modification and are incapable of being abolished. Appellees assert that the right to recover for injuries inflicted by negligence is one such jural right and that the PLA is unconstitutional because it eliminates their cause of action for negligence. *Perkins v. Northeastern Log Homes,* Ky., 808 S.W.2d 809 (1991). Appellees are mistaken, however, because their assertion is based upon a misconception of the PLA. The PLA does not attempt to abolish a right of recovery, be it jural or otherwise, it merely codifies long established Kentucky law that a manufacturer, under whatever legal theory, is not liable for injuries following the alteration, destruction, or mutilation of its product, or by its misuse which was not reasonably foreseeable. Consistent with proper negligence theory, such conduct would be an independent intervening cause of the injury. *See Lloyd v. Lloyd,* Ky., 479 S.W.2d 623 (1972); *Collins Co. v. Rowe,* Ky., 428 S.W.2d 194 (1968); and

*C.D. Herme v. R.C. Tway Co. Inc.,* Ky., 294 S.W.2d 534 (1956).

The General Assembly declared its purpose in the preamble to the PLA by stating that "it is in the interests of the public, consumers, manufacturers, wholesalers, retailers, and insurers, for the General Assembly to codify certain existing legal precedents and to establish certain guidelines which shall govern the rights of all participants in products liability litigation." The statutes here under review are no more than a codification of existing principles or a modification of those principles well within legislative authority. They do not violate any viable concept of jural rights. *Perkins v. Northeastern Log Homes,* Ky., 808 S.W.2d 809 (1991).

■ As a final matter, we turn to the Court of Appeals creation of a new cause of action for "spoliation of evidence." In its opinion, the court recognized that "sanctions are provided for intentional or negligent destruction of relevant evidence," but insisted that recognition of the tort of spoliation was "consistent with the statutory and common law of this jurisdiction." The court then delineated the elements of the intended tort and remanded to the trial court to permit appellees' amendment of their complaint for recovery under this cause of action.

We decline the invitation to create a new tort claim. Where the issue of destroyed or missing evidence has arisen, we have chosen to remedy the matter through evidentiary rules and "missing evidence" instructions. *See Tinsley v. Jackson,* Ky., 771 S.W.2d 331 (1989) *and Sanborn v. Commonwealth,* Ky., 754 S.W.2d 534 (1988). The Court of Appeals recognized that only three states have adopted this tort claim. The vast majority of jurisdictions have chosen to counteract a party's deliberate destruction of evidence with jury instructions and civil penalties. Representative of this approach is *Federated Mutual Insurance Co. v. Litchfield Precision Components, Inc.,* 456 N.W.2d 434 (Minn. 1990). We will remain among those jurisdictions and not now allow such claims for relief.

By virtue of our decision, the remaining issues raised herein have been determined to be moot or insubstantial. The Court of Ap-

peals is hereby reversed and the judgment of the Pike Circuit Court is reinstated.

All concur.